UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MANTACHIE APARTMENT HOMES, LLC, | ) | Case No. 12-12596-JDW |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | |
| MYRTLE APARTMENTS, LLC, | ) | Case No. 12-12597-JDW |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | |
| RIENZI APARTMENT HOMES, LLC, | ) | Case No. 12-12598-JDW |
| | ) | Chapter 11 |
| Debtors | | |

## MEMORANDUM OPINION AND ORDER

These matters come before the Court on the Motions for Relief from the Automatic Stay and Abandonment of Property from Debtor's Estate and for Other Relief filed by Renasant Bank on December 4, 2012 (the "Motions")(Mantachie Doc. 59, Myrtle Doc. 56, Rienzi Doc. 57), and the Debtors' Responses to the Motions (Mantachie Doc. 65, Myrtle Doc. 62, Rienzi Doc. 63).[1] Appearing at the final hearing on February 21, 2013, were D. Andrew Phillips and Scott Hendrix, attorneys for Renasant Bank ("Renasant") and Craig M. Geno, attorney for Mantachie Apartment Homes, LLC ("Mantachie"), Myrtle Apartments, LLC ("Myrtle"), and Rienzi Apartment Homes, LLC ("Rienzi," and together with Mantachie and Myrtle, the "Debtors"). Scott Williams, a corporate representative of Renasant, and Robert Keith Farrar, the sole member of Affordable Housing Mississippi, LLC ("Affordable"), which is the sole member of each of the Debtors, also appeared

---

[1] The Motions were heard together and involve the same facts, circumstances and testimony.

1

and testified at the hearing. The Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334(b) and the United States District Court for the Northern District of Mississippi's Order Of Reference Dated August 6, 1984. This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(G). The Court in this matter must decide whether Renasant should be granted relief from the automatic stay to exercise its in rem state law remedies as to its collateral. This Court has considered the pleadings, the arguments of counsel, the testimony, the evidence admitted, and the law, and finds and concludes as follows.[2]

## **FINDINGS OF FACT**

The Debtors are owned entirely by Affordable, which is, in turn, owned solely by Robert Keith Farrar. Each of the Debtors operates an apartment complex in the Mississippi town referenced in its name. On April 30, 2008, Affordable executed three separate documents entitled Multipurpose Note and Security Agreement in favor of Renasant (collectively, the "Notes"). Each of these Notes was secured by a Land Deed of Trust, executed by the Debtor whose apartment complex served as security for that Note (collectively, the "Properties"). The Note secured by Mantachie's property was in the original principal amount of $297,129.63, the Note secured by Myrtle's property was in the original principal amount of $248,609.10, and the Note secured by Rienzi's property was in the original principal amount of $297,927.73, for a total original principal indebtedness of $843,666.46. Pursuant to the unrebutted testimony of Scott Williams, Renasant's First Vice President and Special Assets Officer, the outstanding balances due on the Notes as of February 20, 2013 were $371,234.42 on the Mantachie Note, $315,522.40 on the Myrtle Note, and $372,189.61 on the Rienzi Note.

---

[2] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

Accordingly, as of February 20, 2013, a total of $1,058,946.43 was due to Renasant under the Notes, with interest, fees, and costs continuing to accrue pursuant to the terms of those Notes. Although some interest payments and perhaps some sporadic other payments have been made on the Notes, there have been no regular payments under the Notes since prior to October 2010.

On October 14, 2010, Affordable filed its chapter 11 bankruptcy petition, and its case remains pending in this Court (Case No. 10-14827-JDW). The automatic stay was lifted in that case pursuant to Affordable's undisputed default of an agreed order resolving Renasant's motion to prohibit Affordable's use of Renasant's cash collateral (Affordable Docs. 103 and 173), and the Debtors' Properties were set for foreclosure sales on June 27 and June 28, 2012. On June 26, 2012, the Debtors filed their respective petitions for relief under chapter 11 of the Bankruptcy Code[3] to stop the foreclosures. Pursuant to this Court's post-petition directives, Renasant held the foreclosure sales of the Debtors' Properties on June 27 and June 28, 2012, but did not record the resulting trustee's deeds. Scott Williams testified that Renasant attorney Scott Hendrix conducted the foreclosure sales, at which Mr. Hendrix announced that any resulting trustee's deeds could not be recorded and that the sales could not be completed without further approval of this Court. Despite this announcement, Williams testified that there was "spirited" bidding from several sale attendees, which resulted in winning bids of $308,100.00 for the Mantachie property, $260,000.00 for the Myrtle property, and $315,000.00 for the Rienzi property, for a total of $883,100.00.

On June 28, 2012, Renasant filed its first motion for relief from stay in these cases (the "First Motion for Relief") (Mantachie Doc. 7, Myrtle Doc. 7, Rienzi Doc. 7). In its First Motion for Relief, Renasant requested that the stay be lifted to permit it to finalize its foreclosure sales, or, alternatively,

---

[3] All references to Bankruptcy Code are to Title 11 of the United States Code.

3

that the Court dismiss these cases as being filed in bad faith. After multiple hearings, the Court entered an Order Granting in Part and Denying in Part the First Motion for Relief, in which it denied the motion to dismiss for bad faith, but ordered the Debtors and/or their owner, Affordable, to pay Renasant certain adequate protection payments (the "Adequate Protection Order") (Mantachie Doc. 27, Myrtle Doc. 25; Rienzi Doc. 26). Pursuant to the terms of the Adequate Protection Order, the Debtors were ordered to pay Renasant the monthly interest payments of $3,171.01 beginning in September 2012 if the Debtors' Properties had not been sold. Renasant agrees that these payments have been timely made, but Scott Williams testified at the hearing that Renasant was satisfied with the amount of the adequate protection payments only because of the allegedly imminent closings of the sales of the Properties. The monthly operating reports of the Debtors for October, November, and December were entered into evidence, and show insufficient net income to provide any consistent, ongoing payments of principal to Renasant.

The Debtors have long represented to Renasant and to this Court that they intend to sell their Properties. Effective June 18, 2012, each of the Debtors entered into an Agreement to Purchase and Sell its respective Property (collectively, the "Sale Agreements"). The Sale Agreements were between each Debtor, as the seller, and Equity Properties, LLC, as buyer for each Property ("Equity"). The Sale Agreements provided that Equity had a 15-day inspection and due diligence period, and that the closings of the sales were to occur within 30 days of the expiration of the due diligence period. On August 27, 2012, the Debtors filed Motions to Sell Substantially All of the Assets of the Debtor-in-Possession, Free and Clear of Liens, Claims and Interests, with Liens Attaching to Proceeds of Sale, Outside the Ordinary Course of Business in each of their cases, attaching the attendant Sale Agreement as Exhibit A to the respective motions (the "Sale

4

Motions")(Mantachie Doc. 37, Myrtle Doc. 34, Rienzi Doc. 35). The sale prices were $464,000.00 for the Mantachie property, $350,000.00 for the Myrtle property, and $478,000.00 for the Rienzi property, for a total of $1,295,000.00 for the three Properties. Renasant filed limited objections to the Sale Motions, because the Sale Motions did not expressly provide for Renasant's right to credit bid to preserve its interests, but Renasant otherwise supported the Sale Motions. (Mantachie Doc. 43, Myrtle Doc. 40, Rienzi Doc. 41). The parties agreed that the purchase price for the Properties was enough to pay Renasant in full and to cover outstanding ad valorem taxes and a surcharge on the proceeds for any unpaid administrative expenses.

This Court held a consolidated hearing on the three Sale Motions on October 9, 2012. At the hearing, Robert Farrar testified on behalf of the Debtors in support of each of the Sale Motions. Mr. Farrar testified in the case of each Sale Agreement that he personally conducted the negotiations with Equity to reach the Sale Agreements, that the Sale Agreements were entered into in good faith, that Equity was a good faith purchaser after arms' length negotiations, and that there were no side deals, unwritten agreements or other understandings of which the Court should be aware. Mr. Farrar further testified that he was satisfied with the purchase prices, and that he tried to sell each of the Properties before, but that he received no offers equal to or greater than the amounts offered by Equity. Finally, Mr. Farrar recommended to the Court that it approve the Sale Motions. Near the end of that hearing, counsel for Renasant, D. Andrew Phillips, cross-examined Mr. Farrar with regard to the closings of the sales of the Properties:

> Mr. Phillips: "I would like to know when you anticipate closing."
> Mr. Farrar: "They said within 30 days of when I got court approval."

5

> Mr. Phillips: "Is the potential purchaser - Equity - is it ready to close presently?"
>
> Mr. Farrar: "Is it ready to close?"
>
> Mr. Phillips: "Yes."
>
> Mr. Farrar: "Yes, I would say so, when we get court approval."

Based on the testimony provided, the Court entered Orders Granting the Sale Motions on October 16, 2012 (the "Sale Orders")(Mantachie Doc. 48, Myrtle Doc. 45, Rienzi Doc. 46). Mr. Farrar's testimony regarding the closing of the sales has now been proven to have been patently false. Mr. Farrar purposefully lied to the Court, under oath, about material aspects of these cases, in an effort to induce the Court to enter the Sale Orders and, presumably, to buy himself more time at Renasant's expense.

Unsurprisingly, the sales of the Debtors' Properties contemplated by the Sale Orders never closed. On December 4, 2012, Renasant filed the Motions that are the subject of this Memorandum Opinion and Order. In its Motions, Renasant requests relief from the stay for cause under 11 U.S.C. § 362(d)(1), alleging that its interests in the Debtors' Properties are not being adequately protected, because the Debtors have no cash flow or other available sources of income to either sustain a plan of reorganization or make adequate protection payments. The Court held a hearing on the Motions on February 21, 2013. At the hearing on the Motions, Mr. Farrar again testified on behalf of the Debtors. He testified that the reason that the Sale Agreements did not close was that Equity decided "they did not like the income coming in from the apartments." When asked when Equity made that decision, Mr. Farrar replied, "sometime during their due diligence period; I don't remember exactly right now." When pressed further as to when Equity told him it would not close, Mr. Farrar stated, "[s]ometime in July – I think about mid-July– really, we had a closing date set and they declined to

close;" and "I had no control over their closing. They just refused to close." When Mr. Phillips asked him: "So, these contracts were dead in the water in July?" Mr. Farrar responded, "[i]n July. That is correct." The Sale Motions were filed on August 27, 2012– over a month after Mr. Farrar became aware that the Sale Agreements had been terminated. At the time of the hearing on the Sale Motions, Mr. Farrar had known for almost three months that the sales were not going to close, but chose not to apprise the Court, Renasant, or even his own attorney of that material fact.[4] Rather, Mr. Farrar testified, unequivocally, that Equity was ready to close within 30 days of Court approval.[5]

Mr. Farrar testified that he had recently engaged a realtor on behalf of the Debtors to market and sell the three Properties. He further testified that he believes he can get $450,000.00 each for the Mantachie and Rienzi Properties and $350,000.00 for the Myrtle property, for a total of $1,250,000.00. However, despite Mr. Farrar's marketing attempts over the past 8 months, he has received no other offers for the Properties at this price or otherwise, other than the offers memorialized in the terminated Sale Agreements. Furthermore, no application to employ a realtor has been filed in these cases.

The entire purpose of these bankruptcy cases was to sell the Properties. All delays in

---

[4] Mr. Farrar testified that he "probably" told his attorney prior to the hearing on the Sale Motions that Equity had terminated the Sale Agreements. The Court does not find this testimony at all credible.

[5] Mr. Geno attempted to rehabilitate Mr. Farrar's testimony by eliciting further testimony from Mr. Farrar, in which he stated that he had not yet given up on the sales to Equity and that he continued to market the Properties to Equity. However, Mr. Farrar continued to expose his prior misrepresentations to the Court, later testifying that, "[t]hey (Equity) didn't move to close them, so I assumed the contract was no good anymore. They told me they wasn't going to close." Further, in an attempt to explain why he told no one about Equity's refusal to close, Mr. Farrar testified that he thought that the Sale Orders permitted the Debtors to sell the Properties to anyone (presumably to absolve himself of any responsibility to let anyone–even his attorney-- know that the Sale Agreements with Equity were "dead in the water"). This testimony is not credible.

7

allowing the foreclosures to proceed were predicated on the pending sales. Each of the chapter 11 plans filed by the Debtors were predicated entirely on the sales (Mantachie Doc. 42, Myrtle Doc. 39, Rienzi Doc. 40). The Court has now learned that Mr. Farrar knew that the sales were not going to close before the plans were filed, before the Sale Motions were filed, and certainly before he specifically testified under oath that the sales were ready to close upon court approval. Mr. Farrar has been marketing these Properties for months, with no buyers ready, willing, and able to commit to purchasing the Properties at or near the asking prices. Given Mr. Farrar's past misrepresentations, the Court has no confidence in his testimony as to when he might be able to sell the Properties in the future or at what price. Accordingly, the only credible evidence of value is the evidence presented by Renasant of the prevailing foreclosure bids. The prevailing bidders (after competitive bidding) were ready to pay a total of $883,100.00 cash for the Properties. Therefore, based on the testimony at the hearing and the other evidence presented, the Court finds that the Debtors' valuation estimates are far too optimistic and that the fair market values of the Properties are closer to the prevailing bids at the foreclosure sale. Renasant has proven by a preponderance of the evidence that the Debtors have no equity in the Properties sufficient to adequately protect Renasant's secured interest in the Properties.

## II. CONCLUSIONS OF LAW

The filing of a petition for relief under any chapter of the Bankruptcy Code operates as a stay of certain actions. 11 U.S.C. § 362(a). Typically, the actions stayed are actions by creditors to recover from the debtor, property of the debtor, or property of the estate for a debt that arose prior to the petition date. A party in interest may obtain relief from this automatic stay under the provisions of 11 U.S.C. § 362(d). Subsection (1) of § 362(d) provides that the court shall grant relief

from the stay upon a showing of "cause" including (but not limited to) the lack of adequate protection of an interest in property.[6] In a motion for relief from stay, the burden of proof is on the debtor as to all issues except the issue of the debtor's equity in the property. 11 U.S.C. §362(g); *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.)*, 793 F.2d 1380, 1388 (5th Cir. 1986)(*vacated*, 802 F.2d 777, *reinstated on reh'g en banc*, 808 F.2d 363, 364 (5th Cir. 1987), *aff'd*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). A bankruptcy court has broad discretion in determining whether to lift the automatic stay. *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.)*, 440 F.3d 238, 251-52 (5th Cir. 2006)(citing *Bustamante v. Cueva (In re Cueva)*, 371 F.3d 232, 236 (5th Cir. 2004)).

According to 11 U.S.C. §362(d)(1), the court shall grant relief from the stay upon a showing of "cause," including the lack of adequate protection of the movant's interest in property. "Cause" is not defined in that statute, giving bankruptcy courts the flexibility to define cause in a particular case. *Little Creek Dev. Co. v. Commonwealth Mtg. Corp. (In re Little Creek Dev.Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986). Whether cause exists to grant relief from the stay is determined on a case-by-case basis, based on the totality of the circumstances. *In re Mack*, 347 B.R. 911, 915 (Bankr. M.D.Fla. 2006). Many courts have found a debtor's bad faith, or lack of good faith, to constitute "cause" for lifting the stay to permit creditors to proceed in rem against a debtor's property. *Little Creek Dev. Co.*, 779 F.2d at 1072(collecting cases); *See also Mack*, 347 B.R. at 915. The Bankruptcy Code requires that debtors act in good faith in both the commencement and prosecution of bankruptcy proceedings, and good faith is an intrinsic component of the bankruptcy process. *Little Creek Dev. Co.*, 779 F.2d at 1071. The good faith requirement imposed on all debtors seeking

---

[6] Renasant did not seek stay relief under any other subsection of § 362(d).

9

the protection of the bankruptcy courts prevents abuse of the bankruptcy process and safeguards the integrity of the courts by only permitting those with clean hands to avail themselves of the Bankruptcy Code's "powerful equitable weapons." *Id.* at 1072. The automatic stay of 11 U.S.C. § 362(a) is one such weapon, because it prevents creditors from exercising their rights against a debtor or its property so that the debtor has time to reorganize and rehabilitate its finances.

The Debtors acting through Mr. Farrar in these cases have demonstrated bad faith and unclean hands in the prosecution of these bankruptcy proceedings. Mr. Farrar lied under oath so that the Debtors could obtain relief to which the Debtors may not have otherwise been entitled and to forestall their secured creditor from gaining relief to which it may have been entitled. In addition to lying to the Court, it is clear from the evidence presented that Mr. Farrar also has misrepresented material information to both Renasant in obtaining various agreements throughout the pendency of these cases, and to his own attorney. The Court finds and concludes that the Debtors have prosecuted these bankruptcy petitions in bad faith, specifically with regard to the Sale Motions and subsequent activities, and that such bad faith has caused harm to Renasant. Accordingly, the stay is due to be lifted for cause under § 362(d)(1), for the Debtors' bad faith during these bankruptcy proceedings.

In addition to bad faith, a lack of adequate protection of an interest in property is also "cause" for lifting of the stay under § 362(d)(1). In order to defeat the motion for relief from stay due to a lack of adequate protection, the Debtors must prove that Renasant's interest in the Properties is adequately protected. *Timbers of Inwood Forest Assoc.*, 793 F.2d at 1388. The Debtors have failed to do so. The term "adequate protection" is not defined in the Code. Adequate protection has generally been interpreted to encompass "payment, replacement lien, or other relief sufficient to

protect the creditor against diminution in the value of his collateral during bankruptcy." *Bank of New York Trust Co., NA v. Pacific Lumber Co. (In re Scopac)*, 624 F.3d 274, 278, n.1 (5th Cir. 2010). The current interest payments are not sufficient to protect Renasant given the lack of equity proven at the February 21 hearings. Further, the evidence showed that the Debtors do not have the present ability to make any additional payments to Renasant to adequately protect Renasant's interests, and the value of the Properties is not sufficient to provide Renasant with an "equity cushion" that would protect it during the pendency of the cases. Accordingly, even if the stay were not due to be lifted due to the Debtors' demonstrated bad faith, the stay is due to be lifted for cause, due to the lack of adequate protection of Renasant's interest in the Debtors' property, and the Debtors' inability to provide such adequate protection going forward.

### III. CONCLUSION

Based on these findings of fact and conclusions of law, this Court finds that Renasant's Motions are due to be granted. Accordingly, it is hereby

**ORDERED, ADJUDGED AND DECREED** that Renasant's Motions are **GRANTED**. Renasant may proceed to record the trustee's deeds and otherwise consummate the foreclosure sales and/or recommence foreclosure proceedings to sell the Properties to a different purchaser, if necessary. The 14-day stay under Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure is waived.

Dated this 12th day of March, 2013.

_____
Jason D. Woodard
United States Bankruptcy Judge